VICTOR BROADCASTING CO., INC. *v.* MAHURIN.

5-2914                                          365 S. W. 2d 265

Opinion delivered March 4, 1963.

*Moses, McClellan, Arnold, Owen & McDermott,* for appellant.

*Catlett & Henderson, Griffin Smith,* for appellee.

CARLETON HARRIS, Chief Justice. Southwestern Broadcasting Company, an Arkansas corporation, owned and operated Radio Station KVLC in Little Rock. Lake Broadcasting Company, an Arkansas Corporation, operated Radio Station KIKS at Sulphur, Louisiana. Southern National Insurance Company, likewise an Arkansas corporation, owned most of the stock in both broadcasting companies. Robert M. Saxon was the principal stockholder in

this company. Dale Mahurin, appellee herein, was manager of the two stations, and was a minority stockholder in each of the broadcasting corporations, as well as a member of the Board of Directors of each.

In October, 1960, Albert Stegall, representing persons desiring to buy a majority of the stock in each of the broadcasting corporations, commenced negotiations with Saxon for the purchase of such stock from the Southern National Insurance Company. Negotiations culminated in the execution of a contract on February 27, 1961. The prospective purchasers thereupon applied to the Federal Communications Commission for authority to operate the stations, and the applications were approved and the transfer of the stock made, together with the surrendering of the management of the companies, on June 1, 1961. In the meantime, Mahurin continued with his duties as manager, and remained on the Board of Directors of each company.

Following the applications to the Federal Communications Commission, Victor Broadcasting Company, Inc., was incorporated under the laws of this state, and at approximately the same time Victor Radio Company, Inc., was likewise organized under the laws of Arkansas, it being contemplated that the Southwestern Broadcasting Company stock (purchased by Stegall's principals) would be transferred to Victor Broadcasting Company, and the Lake Broadcasting Company stock (likewise purchased by Stegall's principals) would be transferred to Victor Radio Company. On June 15, 1961, a joint stockholders meeting was held between stockholders of Southwestern and Victor Broadcasting Company, at which time said stockholders voted to merge the two companies. On the same day, a similar stockholders' meeting was held between Lake and Victor Radio Company, at which time resolutions were passed authorizing the merger of those two companies. Mahurin was present at both meetings, and voted the shares that he owned in Southwestern, and 14 shares by proxy, for the merger of the first two mentioned companies; he voted the 6,000 shares that he owned in Lake Broadcasting Company and 2,800 shares

by proxy in favor of the merger of the last two mentioned corporations. The merger has never been completely perfected.

The services of Mahurin were terminated on June 20, and twenty days later, appellee asserted to Lake and Victor Radio Company that the attempted mergers were void, and demand was made upon Victor for the fair market cash value of the stock which Mahurin held in the Lake Company. On August 4, 1961, Southwestern instituted suit against appellee, alleging that the latter had converted various items belonging to the broadcasting company to his individual use. Mahurin answered, denied any wrongful acts, and asserted matters justifying the taking; a cross complaint was filed alleging that his vote in favor of the merger was obtained by the fraudulent acts of Southwestern and Victor Broadcasting Company; that representations had been made to him that there would be no changes in the management or policies of the company; that he had relied upon such material representations, and would have voted against the merger except for same, and have demanded payment in cash for his stock interest or provided by the laws of this state. Relief sought concluded with the prayer that he be awarded the fair cash value of his minority stock interest in Southwestern. On August 7, Lake Broadcasting Company filed a suit containing substantially the same allegations, and Mahurin filed an answer and cross-complaint similar to that mentioned above.

After the filing of various substituted pleadings and various amendments, and the substitution of some parties, the cases were consolidated and heard by the Chancery Court. On trial, that court dismissed the complaints of the complaining companies as being without equity, except for amounts admittedly owed the companies by Mahurin. As to the cross-complaint, the court found that the evidence clearly established that Mahurin was induced by fraud and misrepresentations to ''part with the valuable right he had to require the payment to him of the cash value of his stock'' as a condition to the mergers and ''except for such fraud, misrepresentation and concealment the cross-complainant would have been entitled to

receive the fair value of his stock in cash, and that such fair value is the appropriate measure of cross-complainant's damages for the fraud which was perpetrated upon cross-complainant.'' Judgment was rendered for appellee against Victor Radio Company in the sum of $27,927.00 and against Victor Broadcasting Company in the amount of $622.67. The decree further provides that upon payment of the judgments, appellee's stock interest in Lake Broadcasting Company and Southwestern Broadcasting Company "shall be terminated and cease, and cross-complainant, Dale D. Mahurin, is ordered and directed to deliver all of his stock in said corporations to their respective successors for the purpose of cancellations.''

From the decree so entered, comes this appeal. Appellants have abandoned their appeal insofar as it relates to the court's dismissal of the complaints filed against Mahurin, and the only question presented here is whether appellee was entitled to recover on his cross-complaints. While the facts as hereinbefore set out, appear somewhat complicated, the issue is actually quite simple and poses only the question, "Is appellee entitled to receive the fair cash value of his minority stock and, if so, did the chancellor properly determine that value?''

Mahurin testified that when he learned Stegall's group intended to buy the majority interest in the radio stations, he talked to Stegall and a Mr. Tiberris about selling his stock to them, but was advised they did not want to buy his stock because they did not know anything about the radio business, were only buying as an investment, and it was their desire that he stay on and operate the stations. Appellee stated that Stegall assured him that he would have the same privileges, same salary, and same arrangements as previously. He exhibited a letter from Stegall, dated December 27, 1960, which welcomed Mahurin and other employees into the organization, and *inter alia* stated:

"We hope that each of you will remain in your present position and continue to render the dedicated and efficient service that you have in the past.

"I feel that some of your associates may be disturbed at the change of ownership of this stock, however, you may assure them that we plan no change in the management, staff or policy of either station and are looking forward to a long and happy association with each of you."

Mahurin obtained an attorney to prepare a contract of employment, which was done, but appellee stated that Stegall, when shown the contract, though commenting that it appeared to essentially contain the agreement reached, said that it would have to be sent on to a Mr. Muscat, who was out of this country at the time, for approval. The witness testified that, relying upon Stegall's assurances that he would be retained by the company, and that a contract would be entered into, embracing the terms of the one presented to Stegall by Mahurin, the latter voted for the merger. Appellee testified that except for Stegall's assurance, he would not have voted for the merger.

R. M. Saxon, substantially the owner of Southern National Insurance Company, testified that his company purchased KVLC in 1950 and KIKS in 1956, and that Mahurin had been employed as engineer and manager for a period of 13 years. Saxon stated that he, along with Mahurin and Charles W. Davis, constituted the directors of the two companies. He corroborated Mahurin's testimony that the purchasers assured appellee that he would be continued in his employment as manager, at the same salary, and under the same conditions of his (then) present employment. Saxon said that these assurances were given by Stegall and Tiberris.

Charles W. Davis, secretary-treasurer of Lake and Southwestern, likewise testified that the purchasers stated that they would not have bought the stations without being sure Mr. Mahurin would stay; that these statements were made in Mahurin's presence. He added that he saw the contract which Mahurin had caused to be prepared, and the contract embraced essentially the terms that had been offered to Mahurin by the purchasers. Davis testified that he learned about 15 days after the

new owners took over operations that Mahurin had been discharged and he (Davis) was shocked to hear of it. The witness was complimentary of Mahurin's management policies with the stations that he had operated.

Mr. Albert Stegall, secretary of Southwestern, Lake, Victor Broadcasting, and Victor Radio (subsequent to the purchase of the stock), testified that he made no representations whatever to Mahurin relative to the latter's voting for or against the merger. He stated he told Mahurin that the contract which the latter submitted was ridiculous but that he would submit it to the proper people who had authority to sign it. Relative to the letter that he had written to appellee, the witness stated that the purpose of the letter was to allay any apprehension that employees of the staff might have as to their future status under the new management. He testified that Mahurin was removed from his position because a partial audit uncovered additional accounts payable that the purchasers had not theretofore known about; that unpaid accounts in the amount of approximately $15,-000.00 were found, and employees that the purchasers had no prior knowledge of, were listed on the books.

Appellants first contend that the evidence does not justify the court's finding that appellee should be awarded compensation for his minority stock interest. It is argued that there was no fraud, because at the time the promise of continued employment to Mahurin was made, appellants actually were sincere in their representations, and intended to retain Mahurin as manager; that the change of mind occurred because of the alleged irregularities appearing after the audit. Furthermore, appellants assert that the promise related to an event to occur in the future, rather than relating to a present or preexisting fact, and that under our cases, any representations and promises as to future conduct, are merely statements of opinion as to what the promissor intends to do, and the party to whom they are made has no legal right to rely on such representations. We do not agree with either of these contentions. Discussing the last first, appellants' argument that fraud cannot be predicated upon representations of events to occur in

the future is, generally speaking, sound. But this rule of law does not apply if one makes a false promise, knowing at the time that it will not be kept, and injury results to the person relying on same. In *Coleman* v. *Volentine,* 211 Ark. 594, 201 S. W. 2d 592, this court said, ''Ordinarily an action for fraud and deceit may arise only from false representation as to a past or existing situation, but there is authority for the holding that where one makes a false promise, knowing at the time that it will not be kept, the person injured thereby may have relief in action for fraud.''

In *Wilson* v. *Southwestern Casualty Ins. Co.,* 228 Ark. 59, 305 S. W. 2d 677, it is likewise stated:

''A promissory representation may be the basis of fraud in procuring a release if the promissor never intended to fulfill the promise and made it for the purpose of obtaining the release.''

Our most recent holding to this effect was *Thomason* v. *Hester Mobile Home Mfg.,* 235 Ark. 529, 361 S. W. 2d 94. As to the contention that the representation of continued employment was originally made in good faith, we are of the opinion that the weight of the evidence is to the contrary. Proof reflects that approximately a week after appellee voted for the merger, appellants offered to purchase Mahurin's stock at approximately 50% ($12,996) of the value finally allowed by the chancellor. Mahurin asserts that the representations were made to him in order to obtain his favorable vote for the merger, and then to purchase his stock for less than half its value. Appellee states in his brief:

''Is it not also logical that such assurances which induced his cooperative vote were made with absolutely no intention of performance when only six days later he peremptorily received an offer to purchase, which in truth was a demand that he sell his stock, and upon declining, was discharged for sham reasons.''

Be that as it may, we think the circumstances justified the chancellor in reaching his conclusion. It is quite noticeable that though appellants apparently were most

anxious to retain Mahurin at the outset, his services were terminated within two weeks after he had cast his vote in favor of the merger. To say the least, this was most unusual, particularly when it would appear that the new owners had a prior opportunity to examine the records; in fact, several months intervened during the period of negotiations, and the final consummation of the purchase. Apparently, the purchasers had every opportunity to investigate appellee for they had repeatedly told him that they desired to retain his services. During the trial, Stegall was asked, "What did you know about Mr. Mahurin on June 21 you did not know on June 15, 1961?" The witness answered, *"I do not know what I would have known specifically."*

Also, there is some significance in the fact that, while appellants contended that Mahurin had misappropriated funds, suit was not instituted by the corporations until after receiving appellee's notice of July 20, wherein Mahurin asserted that the attempted mergers were void, and made demand for the fair market cash value of the stock which he held in the Lake Company. It might be added that, although this litigation was commenced by the filing of the complaints against Mahurin, and though the chancellor found such complaints were without equity and dismissed them, that ruling has not been appealed to this court, which possibly is indicative of the strength (or lack of it) of appellants' allegations in the first place. At any rate, (we hold that the chancellor's finding that fraud was practiced upon Mahurin, and that appellee relied upon the fraudulent representations to his detriment, is not against the preponderance of the evidence.)

Appellants further urge that appellee is not entitled to recovery because he did not comply with the statutory provisions relative to receiving payment for his stock. This argument has reference to Section 64-703, Ark. Stats. 1957 Replacement, which provides the procedure for payment of the fair cash value of the stock of any stockholder voting against the merger. We do not deem a discussion of this contention necessary, inasmuch as,

in our view, the provisions of that section, and remedies therein granted, are not exclusive where fraud is present. Minority stockholders can maintain a suit for relief if fraud is practiced. *Johnson* v. *Baldwin,* (S. C.), 69 S. E. 2d 585; *Alabama Fidelity Mortgage & Bond Co.* v. *Dubberly, et al,* (Ala.), 73 So. 911; *May* v. *Midwest Refining Co.,* (Me.), 121 F. 2d 431.

It is further asserted that the merger has never been consummated and Mahurin still has all of the stock in Lake and Southwestern that he ever had. This argument can be of no aid to appellants. For one thing, the record reflects that everything necessary to effect the merger has been done except for the technical filing with the Secretary of State; Mr. Joseph Peter Trantino testified that the merger took place on June 15, 1961, but, "Due to the fact that the actual book merger did not take place until August 18, I was elected President of all four corporations on July 3, 1961." He stated that he was the custodian of the records of all four companies. For that matter, it would appear that appellants are estopped by the pleadings to assert that the merger was not completed, for the record reflects that Southwestern Broadcasting Company amended its complaint as follows:

"That the original plaintiff in this action Southwestern Broadcasting Company was merged into plaintiff corporation on or about the 18th day of August, 1961.

"That the style of this action be changed to reflect the plaintiff to be Victor Broadcasting Company, Inc., and that Victor Broadcasting Company, Inc. be substituted for Southwestern Broadcasting Company as plaintiff. That the amended complaint be amended only in this particular and in accordance with the style of this pleading."

An identical amendment to the complaint was filed relative to Lake Broadcasting Company and Victor Radio Company. Having asserted the merger of the corporations, appellants cannot now be heard to deny that fact.

Finally, it is contended that the chancellor used an erroneous method in arriving at the fair cash value of

Mahurin's stock. The stock is not regularly traded, and there appears no set formula to determine the "fair cash value." The court reached the figure allotted on the basis of the testimony of Charles W. Davis. The record reflects that Davis was asked the following question, relative to the Lake stock: "Based on the adjusted[1] purchase price of the contractual purchase price of the majority stockholders, in KIKS, what is the fair cash value of that stock?" The answer was, "Four point eight, five space two." The witness then stated that Mahurin owned 6,000 shares and that the value of his stock, based upon the Saxon sale (as adjusted) to Stegall and his principals, was $29,112. He likewise stated that, using the same formula, Mahurin's three shares of stock in Southwestern had a value of $1,644.00.

We think, since there is no specified formula for determining the "fair cash value" of the stock in question, that the chancellor, under the facts in this case, was justified in basing this value on the testimony of Davis.

Finding no error, the decree is affirmed.

---

[1] This, according to appellee's brief (and which is not disputed by appellants) has reference to a compromise figure reached by the appellants and the Saxon interests. From the brief:

* * * "appellants after first entering into a written contract establishing the per share value subsequently filed a law suit alleging misrepresentations by the Saxon interest and that per share value was then adjusted and compromised by a lower figure. Since appellants, of necessity, acquiesced in the compromise of the suit against Saxon which reduced the contractual value per share they certainly are in no position to complain of the adoption by the Chancellor of the same value they acquiesced in after the Saxon dispute." * * *